# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 9, 2012 Session

## MICHAEL RAY ADKISSON v. TONYA SUZETTE ADKISSON

**Appeal from the General Sessions Court for Blount County**
**No. S-11655     William B. Brewer, Jr., Judge**

_____

**No. E2012-00174-COA-R3-CV-FILED-MARCH 11, 2013**

_____

After a 2006 divorce, both parties petitioned the trial court in 2009 for a modification of the parenting plan and to hold the other parent in contempt. The trial court slightly modified the parent visitation schedule and held the father in contempt for violating the parenting plan's provisions on spring break and medical expense reimbursement. On appeal the father asserts that the trial court erred in the contempt rulings, in not giving him primary custody or substantially equal parenting time and in not holding the mother in contempt. We reverse the father's contempt for his actions during spring break. In all other respects we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Reversed in Part and Affirmed in Part.**

BEN H. CANTRELL, SR. J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and NORMA MCGEE OGLE JJ., joined.

John K. Harber, Chattanooga, Knoxville, Tennessee, for the appellant, Michael Ray Adkisson.

Sally A. Goade, Knoxville, Tennessee, for the appellee, Tonya Suzette Adkisson.

## OPINION

## I. FACTS AND PROCEDURAL HISTORY

This action began on February 11, 2009 when Tony Suzette Adkisson (mother) filed a petition to modify the parenting plan entered in a final divorce on March 29, 2006.

The petition also prayed for a finding of contempt against the father, Michael Ray Adkisson, for failing to comply with the parenting plan's provision for medical reimbursement and visitation during spring break.

Father filed an answer and counter-petition seeking a modification of the parenting plan to provide that he become the primary or equal residential custodian. He also prayed for a judgment of contempt against the mother for failing to return his personal property, her failure to reimburse him for shared medical expenses and for violating the parental bill of rights.

After two days of proof in March and July of 2011, the court filed an order on September 7, 2011, a clarification on November 30, 2011 and a further clarification on December 27, 2011. Taking all the orders together the court's final judgment included the following findings and orders relevant to this appeal:

1. That although a material and significant change of circumstances had occurred, the best interest of the children required that mother remain the primary residential parent and be the sole decision-maker under the four areas set forth in the original parenting plan.

2. That father's co-parenting time be extended from Thursday every other week after school until the children returned to school on Monday morning. When school is not in session the father's time will begin at 1:00 pm on Thursday and end at 9:00 am in Monday morning. The original parenting plan required father to return the children to mother at 6:00 pm on Sunday evenings every other week. The extra overnight was substituted for two evenings every other week from the end of school to 7:15 pm.

3. That the father was in contempt of court for failing to reimburse mother for his share of the children's medical expenses and for not returning the children to mother in accordance with the parenting plan's provision regarding their spring break. Punishment was reserved conditioned on future compliance with the court's orders.

4. That the mother was not in contempt for her failure to reimburse father for her share of the children's medical expenses, for failing to return his personal property or for violating the parental bill of rights.

5. That mother was entitled to recover her attorney's fees and discretionary

costs from father. The court set the award at $17,500. Father appealed.

## I. Modifying the Parenting Plan

The father's first issue on appeal asserts that the parenting plan should be modified to give him substantially equal co-parenting time with the children.

The trial court may modify a child custody award when both a material change of circumstances has occurred and a change of custody is in the child's best interests. *Kendrick v. Shoemaker*, 90 S.W.3d 566 (Tenn. 2002). The trial judge found that there had been a material change of circumstances in this case and neither party has appealed that part of the judgment

Therefore, the sole question here is whether it would be in the children's best interest to give father substantially equal co-parenting time.

The best interest analysis starts with the factors found in Tenn. Code Ann. § 36-6-106(a):

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in §39-15-401 or §39-15-402, or child sexual abuse, as defined in §37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child, if twelve (12) years of age or older; The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; child abuse, as defined in §39-15-401 **or** §39-15-401, **or child sexual abuse, as defined in §37-1-602,**

**(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and**

**(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child...**

**In addition, the same code section exhorts trial judges to consider all other "relevant" factors, including the child's need for stability, in fashioning a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the ten listed factors.**

**At the time of the first hearing below, the parties' oldest child, J.A., was almost thirteen and the youngest child, Z.A., was almost eleven. J.A. testified at the hearing on his father's behalf. He testified that in the past his mother would deny him the right to call his dad on the home phone. Now that he has his own cell phone, she tries to distract him to prevent him from calling. Regarding the visitation schedule, he said he didn't like the dinner nights; he thought they were a waste of time. His preference would be to spend equal time with his parents, staying with each in alternating weeks. On cross examination he said he had told a therapist a lot of bad stuff about his father because his mom told him to. He did admit that his father had told him that if he didn't say he wished to stay with the father, the judge would put their visits under supervision.**

**The therapist had testified earlier that the children had opened up with her early on and shared their feelings about their problems, most of which revolved around their father's treatment of them. They were unhappy that father recorded**

them on video at every exchange with the mother, and at football practice. They complained that he told them what to say and grilled them constantly. Although the therapist encouraged father to participate in the therapy sessions, he attended only on session. He concluded that the therapist was somehow involved in a conspiracy to harm him. In a series of reports to father over a three year period the therapist detailed the children's concerns about being taped when they talked to him. The children said that although father tried to hide the fact that their conversations were being taped, the children knew it and hated being grilled about what had been discussed in the therapy sessions. Their discomfort over the issue finally persuaded the therapist that their sessions were doing more harm than good.

The therapist expressed an opinion that the father emotionally abused the children by taping them, grilling them and making them "a rope in a tug of war." She said that in her years of practice she had never seen such bad conduct on the part of a parent. She also expressed an opinion that if the children had expressed a desire for equal co-parenting, they had been manipulated and coerced by the father.

The trial judge made extensive findings of fact relative to the father's insistence on videotaping the mother at every encounter:

. . . .

xiii. Shortly after the Court hearing described above on the mother's petition for permanent injunctive relief relative to Maryville Christian School, the father began to videotape the mother and sometimes the parties' minor children on every occasion that they came in contact with one another which included but was not limited to the exchange of the parties' minor children, attendance at ball games, attendance at karate events, attendance at sports practices, attendance at school functions, and attendance at any other extracurricular activities of the children where both the mother and father were present.

xiv. The father both before and after the above described Court hearing also consistently made secret recordings of the mother, the children's schoolteachers, the children's school administrators, the children's medical providers, and basically any other person that he came in contact with relative to any issue relating to the parties' minor children or the mother

-5-

**xxiv.** In the videos the father is obviously making the minor children uncomfortable in attempting to get them to come from the mother's car to his car in an effort to intimidate the mother and control the child. The children appear torn and uncomfortable in the videos.

**xv.** In another video, it rises to the level of such harassment that the child's Midget League coaches confront the father and advise him not to have the video camera back at practice as the football practice is supposed to be about the children and not the place for this type of conduct.

**xvi.** The father tries to justify his video taping saying the same is to try to protect him from the mother taking an order of protection when the proof in this case shows that the mother took one order of protection at the beginning of the original divorce which was ultimately dismissed when the divorce was resolved. The mother had never taken any other petition for order of protection against the father and the father has presented no credible evidence of any type whatsoever that the videotaping that he was conducting was in any way justified to protect himself.

**xvii.** The above described videotaping of the mother by the father was not justified under any circumstances whatsoever and in fact was a tool of aggression used by the father to harass and intimidate the mother and was not a defensive tool as the father has maintained.

**xviii.** The above described videotaping of the mother and the parties' minor children by the father was detrimental and harmful to the parties' minor children and not in their best interest.

**xix.** The father has narcissistic and controlling behavior traits such that he addresses most issues relating to the children without regard for the children's welfare but from a perspective of how he is affected by decisions made.

In addition, the trial judge made the following finding with respect to the therapy sessions:

. . . .

**xxxviii.** The proof also shows that the father interrogated the grilled

-6-

the children relative to therapy sessions with Dr. Flagler and that he intimidated and coerced the children into making statements which he felt would be beneficial to him and he recorded the same. The father denies such interrogations and grilling and the Court finds the father's testimony to be uncredible on this issue. The Court finds the father's conduct in interrogating and coercing the children to be contrary to their best interests.

The trial judge also found the therapist to be a credible witness who had the children's best interest at heart. With respect to J.A.'s testimony about his mother's actions, the trial judge said, "I just, frankly had to discount a lot of what the child testified. I just didn't find it to be believable to a certain extent."

On the other hand, the father insists that the mother instructed J.A. to lie to the therapist; that she has attempted to marginalize and minimize his role as a parent. He points to an instance where J.A. was hospitalized for a test and father was not notified. When he showed up the mother had him removed by security. Mother has another habit of removing school information from the boy's backpacks before visits with the father. She refused to allow the children to obtain passports so they could enjoy trips abroad with the father, and she refused to implement a 504 treatment plan at school to better address J.A.'s treatment for juvenile diabetes.

Considering the ten factors set out in Tenn. Code Ann. § 36-6-106(a), it appears that factors (1)(2)(4)(6) and (9) do not favor one parent over the other. Factors (3) and (6) favor continuation of the current plan. There is no proof that the children's grades have suffered or that their social development has been adversely affected. Factors (5), (8) and (10) favor the mother. While this Court does not label the father as mentally ill, the zeal with which he tries to prove himself right and the lengths he goes to show everyone else is against him clouds his judgment with respect to the best interests of the children. This Court concurs in the trial court's conclusion that the compulsive videotaping of the mother and children was harmful to the children and not in their best interests.

Factor (7) favors the father. J.A. did testify that he would like to spend equal time with his parents. It is not clear how much the trial judge discounted that testimony, but giving it full credit, it is only one factor and does not indicate he is seriously unhappy with the current plan.

A trial court has broad discretion regarding a custody determination, which will not be disturbed absent an abuse of that discretion. *Kendrick*, at 566. We cannot find that the trial judge's refusal to name the father as the primary residential parent or to give him substantially equal co-parenting time was an abuse of that discretion.

## II. Father's Contempt

### a. The Spring Break Issue

The trial judge found the father in contempt for violating the parenting plan's provision regarding visitation during spring break.

The parenting plan provided the following under the heading, Spring Vacation:

> The day-to-day schedule shall apply except as follows: The parties shall alternate Spring Vacation with the mother having the children in odd years and the father having the children in even years.

The term "Spring Break" is not defined in the parenting plan. It is defined in the school calendar as the school days actually missed during the break.

In 2010 the father took the children on the Thursday or Friday (when school let out) the week before spring break on a trip to New York. That week-end was the mother's normal parenting time. The children were with the father all the next week and returned to the mother on a Sunday evening nine days later.

The mother testified that she was willing to let the children go on the trip if the father would make it up to her soon. He refused to make that promise and he said they would treat the schedule the same way in the future and she could have the children with her through the whole nine day period even though it affected his parenting time. The first day of the hearing below was during the spring break in 2011. Mother testified that the children would be with her through the weekend even though that week was father's weekend under the usual schedule. The parties observed the same schedule during spring break in 2009.

The trial judge's conclusions on the issue include the following:

viii.  The father deceitfully lied to the mother by telling her that he wanted the weekend before spring break due to the trip but he would return the children to the mother for the weekend following spring break, in essence exchanging the weekends with the mother.  She complied with the father's request and allowed the children to go to New York and upon their return the father refused to return the children to the mother for the weekend.

x.  The father by deceit and deception deprived the mother of her co-parenting time on Thursday, Friday, Saturday and Sunday prior to spring break.

We think the trial judge's conclusions are not supported by the evidence.  The mother testified that she agreed to let the children go with the father when they got out of school the week before the actual break – but she didn't testify that he promised to bring them back to her the next week-end.  Her testimony was that he said he would make the same concession to her the next year – as he had the year before.  Father adamantly denied making the promise.  The next year she kept the children through his normal weekend.

Beyond the deceit issue, however, we are not convinced that the spring break was so well defined that a person of ordinary prudence would have known that the weekends on both sides of the actual week school was out were not included.  Especially since the parties had treated them as being included in 2009.  Many parents would consider themselves and the children to be on spring break on the weekends before and after the days classes had been suspended.

As the Supreme Court has said, "vague and ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt." *Konvalinka v. Chattanooga – Hamilton County Hospital*, 249 S.W.3d 346 at 356 (Tenn. 2008).  "Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge." *Id.*

Whether the standard to be applied in reviewing this part of the order is a preponderance of the evidence (civil contempt) or beyond a reasonable doubt (criminal contempt) the proof does not support a finding of contempt for violating the spring break provision in the parenting plan.

The lower court's order holding father in contempt for violating the spring break provisions of the parenting plan in 2010 is reversed.

### b. The Medical Expense Reimbursement Issue

The trial judge also held the father in contempt for failing to comply with the parenting plan's provisions concerning the payment of his share of the uncovered medical expenses.

The parenting plan provision reads as follows, under the heading Health and Dental Insurance:

. . . .

Uncovered reasonable and necessary medical expenses and supplies, which may include but is not limited to, deductibles or co-payments, eyeglasses, contact lens, routine annual physicals, and counseling will be paid by ( ) mother ( ) father ( X) the parents will be responsible for one-half of the above expenses. After insurance has paid its portion, the parent receiving the bill will send it to the other parent within ten days. The other parent will pay his or her share within 30 days of receipt of the bill.

The court's conclusions on this issue include the following:

. . . .

ii. The father is found to be in willful contempt of Court for his failure to reimburse the mother for medical expenses incurred because he willfully and without justification denied payment of the counseling expenses for Dr. Katy Flagler despite her being a Court ordered therapist for the children and because the excuses that he set forth in Exhibits 1 and 2 are disingenuous and not at all legal justification for refusing reimbursement of the bills submitted.

iii. The Court finds the father to be in willful contempt on this issue but reserves any punishment for said contempt conditioned upon the father's future compliance with the Court's Orders regarding this issue.

We have reviewed the transcript and find that the court's conclusions are supported by substantial and material evidence.

Tenn. Code Ann. § 29-9-102(3) provides that courts have the power to punish any "party, juror, witness or any other person" for "the willful disobedience or resistance…to any lawful writ, process, order, rule, decree, or command" of the Court. The statute may be the basis for punishment of either civil or criminal contempt. *Flowers v. Tennessee Trucking Assn Self Insurance Group Trust.*, 209 S.W.3d 602 (Tenn. Ct. App. 2006). The differences between the two being the remedy sought and the burden of proof to establish guilt. *Id.* Guilt for criminal contempt must be established by proof beyond a reasonable doubt. *Block v. Blount*, 938 S.W.2d 394 (Tenn. 1996).

The parties do not spend much time in their briefs arguing whether the contempt in this case is civil or criminal. The trial judge did not impose any punishment; instead the court held that punishment would be suspended "conditioned upon father's future compliance with the Court's Orders regarding this issue." This sanction suggests that the trial court was holding the father in civil contempt, i.e. allowing him to purge the contempt by future compliance. See, *Flowers*, supra. Therefore, the proof of guilt may be established by a mere preponderance of the evidence.

The distinction between criminal and civil contempt, however, may be entirely academic in this case, because the proof of guilt rises to the standard of "beyond a reasonable doubt." There is no question that the father did not pay his share of the therapist's fees, and there is no question that he refused to pay many of the other bills. The trial judge found that his excuses for his non-compliance were "disingenuous and not at all legal justification for refusing reimbursement." We concur in that finding.

We affirm the finding of contempt for the father's refusal to pay his share of the medical bills.

### III. Mother's Contempt

The father asserts in his brief that the trial court erred in failing to hold the mother in contempt for (1) violating the medical expense reimbursement provision of the parenting plan, and (2) violating the parental bill of rights set forth in the parenting plan.

The father's counter-petition alleged that the mother had willfully failed to provide verification of the children's medical expenses on a timely basis or to reimburse the father for her share of the expenses. In addition, the father alleged that since the parties' divorce the mother had initiated an intentional pattern of misconduct by making derogatory remarks about the father, by her refusal to co-operate with him and by restricting his communication with the children. All the alleged misconduct would be a violation of the parental bill of rights.

The counter-petition prays that the mother be held in willful <u>criminal</u> contempt and punished accordingly, including the potential for incarceration. The trial court refused to hold the mother in contempt on either charge

On these two issues, the difference between civil and criminal contempt is significant. In addition to the rights guaranteed by our Constitution, an acquittal of criminal contempt implicates the Constitution's double jeopardy provisions. *Ahern v. Ahern*, 15 S.W.3d 73 (Tenn. 2000). "Thus, an appeal from an acquittal of criminal contempt is barred." *Overnight Transportation Co. V. Teamsters Local Union No. 480*, 172 S.W.3d 507, at 510 (Tenn. 2005).

The father's appeal on these two issues is, therefore, dismissed.

### IV. Attorney's Fees

The father asserts on appeal that the trial court erred in ordering him to pay the mother's attorney's fees and in refusing to award him his attorney's fees as the prevailing party.

Tenn. Code Ann. § 36-5-103(c) empowers the courts to award to either spouse "reasonable attorney fees incurred...in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child or children of the parties...in the discretion of the court." When the court exercises its discretion that decision will not be disturbed unless there is clear evidence that the court abused its discretion. *Longschmidt v. Longschmidt*, 81 S.W.3d 741 (Tenn. 2002).

The trial judge awarded the mother $17,500 in attorney fees. The father does not attack the reasonableness of the amount awarded; he simply asserts that he, rather than the mother, should have been awarded his attorney fees as the prevailing party. As the foregoing parts of this opinion demonstrate, the father

prevailed at the trial court on a slight modification of visitation. The mother prevailed on the others.

The trial judge held that the mother was the prevailing party. We are convinced that the evidence does not preponderate against that finding. Therefore, the award of attorney fees to the mother is affirmed.

The trial court's order holding the father in contempt for violating the spring break provisions of the parenting plan is reversed. Otherwise, the trial court's order is afirmed and the cause is remanded to the General Sessions Court of Blount County for any further proceedings the may become necessary. Tax the costs on appeal to the parties equally.

_____
**BEN H. CANTRELL, SENIOR JUDGE**